UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PORTER SMITH,

       Plaintiff,

v.                                  Civil Case No. 20-10421
                                   Honorable Linda V. Parker

MICHIGAN DEPARTMENT OF
CORRECTIONS and STATE OF
MICHIGAN,

       Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [25] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [26]

Plaintiff, a former corrections officer at the Macomb Correctional Facility, brings this employment discrimination action against Defendants, the Michigan Department of Corrections and the State of Michigan, for allegedly failing to accommodate his hip injury and retaliating against him in violation of the Rehabilitation Act. Before the Court are Plaintiff's Motion for Summary Judgment [25] and Defendants' Motion for Summary Judgment [26]. They have been fully briefed, (ECF No. 29; ECF No. 30; ECF No. 31; ECF No. 33), and are appropriate for determination without a hearing. *See* L.R. 7.1(f)(2). For the reasons set forth below, Plaintiff's Motion [25] will be **DENIED**, and Defendants' Motion [26] will be **GRANTED in part and DENIED in part**.

# I.   BACKGROUND

## A.   Plaintiff's Impairment and Accommodation Requests

Plaintiff began working for the Michigan Department of Corrections ("MDOC") in 1998. (ECF No. 26-3, PageID.267). On July 1, 2017, while stationed at the Macomb Correctional Facility ("MCF"), Plaintiff "felt [his] hip pop" while trying to handcuff someone who had just taken part in a fight. (*Id.* at 284, 289, 381). According to Plaintiff, as soon as the adrenaline wore off, he began experiencing "excruciating pain in [his] left hip." (*Id.* at 289-90). Plaintiff was hospitalized overnight and began a prolonged period of leave from work the following day. (ECF No. 26-4, PageID.407; ECF No. 26-6, PageID.519).

Plaintiff was eventually diagnosed with "moderate-to-severe arthrosis of the left hip." (ECF No. 26-4, PageID.410).[1] Over the next several months, MDOC repeatedly extended Plaintiff's return-to-work date while he sought treatment. (ECF No. 26-3, PageID.306-10; ECF No. 26-6, PageID.524, 527, 533). Early on, Plaintiff was told that he might need hip-replacement surgery, however, he was initially hesitant to schedule an operation, and instead pursued alternative remedies such as plasma injections and physical therapy. (ECF No. 25-10, PageID.200; ECF No. 26-

---

[1] Plaintiff believes that the July 1 incident "exacerbated whatever was going on" with his osteoarthritis. (ECF No. 26-3, PageID.299). Defendant, however, notes that Plaintiff's workers' compensation claim was ultimately denied and argues that his "injury was not work-related." (ECF No. 26, PageID.234; ECF No. 26-3, PageID.300; ECF No. 26-6, PageID.564, 574, 587). Ultimately, because the parties agree that Plaintiff qualifies as "disabled," the Court need not resolve the precise etiology of his condition. (ECF No. 25, PageID.106; ECF No. 26, PageID.243).

3, PageID.302; ECF No. 26-4, PageID.408). Unfortunately, these alternative treatments were unsuccessful, and after five months, Plaintiff had exhausted all of his available leave. (ECF No. 26-6, PageID.486, 521). Accordingly, he resigned himself to returning to work in early December, still impaired, but with "accommodated restrictions" specified by his doctor. (ECF No. 26-3, PageID.310; ECF No. 26-6, PageID.516).[2]

After working for a short period in MCF's arsenal,[3] Plaintiff was assigned to a transitional employment ("TE") position in the training department. (ECF No. 26-3, PageID.310-11, 357, 383-84; ECF No. 26-5, PageID.437; ECF No. 26-6, PageID.512; ECF No. 26-7, PageID.614). Although Plaintiff's physical work restrictions were initially set to expire on January 17, 2018, MDOC repeatedly extended Plaintiff's TE assignment at the request of his doctor. (ECF No. 26-6, PageID.471, 484, 493, 502, 512, 516).

The first two of these extensions, in January and March, were approved without incident. (*Id.* at 493, 502). In April, however, it became clear to MDOC that

---

[2] The approved restrictions included: no lifting more than ten pounds, bending, twisting, climbing, squatting, or kneeling, and limited standing and walking—a "sitting job" performing "office type work" only. (ECF No. 26-6, PageID.512).

[3] MCF's arsenal was Plaintiff's former regular assignment. (ECF No. 26-3, PageID.310). It is where "all of the equipment is handed out to . . . officers" and working there requires little or no contact with people in custody. (*Id.* at 273, 311). The precise number of days or weeks Plaintiff worked in the arsenal upon his return to MCF is unclear. (*Id.* at 311, 383-84; ECF No. 26-5, PageID.420; ECF No. 26-6, PageID.512).

Plaintiff's restrictions were going to extend until at least July, more than six months from when he was first placed on TE status. (ECF No. 25-3, PageID.164). This posed a problem in light of MDOC's general practice of limiting light duty and TE assignments to six months. (ECF No. 25-5, PageID.181; ECF No. 26-7, PageID.616). Joanne Bridgford, MDOC's EEO Administrator, was open to Plaintiff's TE assignment being extended until July, but Warden Patrick Warren was only willing to approve an extension until June 13, exactly six months from when Plaintiff first entered TE status. (ECF No. 25-3, PageID.163-64; ECF No. 26-6, PageID.484). The Warden stated that he would reevaluate the situation as June drew nearer. (ECF No. 25-3, PageID.163).

In early June, Plaintiff's doctor requested that his restrictions be extended a fourth time—for an additional three months. (*Id.* at 162). Ms. Bridgford recommended denying this request. (*Id.*). Five minutes after receiving her recommendation, Daniel Hengesbach from MDOC's Disability Management Unit ("DMU") told HR supervisor Elaine Davis that he would be sending Plaintiff a letter denying the requested extension. (*Id.* at 161; ECF No. 25-5, PageID.177, 181). It is unclear whether the Warden was ultimately consulted before this denial was communicated to Plaintiff on June 12. (ECF No. 25-10, PageID.200-01; ECF No. 26-3, PageID.311; ECF No. 26-6, PageID.478).

On June 13, HR "received . . . updated restrictions for [Plaintiff]," which lowered the requested extension from three months to one month. (ECF No. 25-3, PageID.160-61). This shorter period was deemed acceptable, and Plaintiff was notified that he would be permitted to stay in a TE assignment until July 13. (*Id.* at 160; ECF No. 26-6, PageID.471). Instead of continuing to work with Institutional Training Officer ("ITO") Felix Felder, however, Plaintiff was assigned to work under Deputy Warden George Stephenson. (ECF No. 25-3, PageID.160; ECF No. 26-3, PageID.336-37). This came as a surprise to Plaintiff, who had primarily assisted ITO Felder in the training department while on TE status. (ECF No. 26-6, PageID.500, 507).[4] The reason for this transfer, Plaintiff later learned, was an active investigation into his alleged sexual harassment of a trainee while stationed in the training department. (ECF No. 26-3, PageID.326, 384); *see infra* Section I.B.[5]

With the end of his accommodated restrictions looming, Plaintiff emailed the Warden. (ECF No. 25-7, PageID.191; ECF No. 25-10, PageID.200; ECF No. 26-3, PageID.326). His message argued that he was being treated differently than Shaun MacLean, another corrections officer who had been injured on the job. (ECF No.

---

[4] At one point in mid-January, HR attempted to staff Plaintiff in "the bubble," MCF's control center. (ECF No. 26-6, PageID.500, 507). After several days, however, Plaintiff "experienced some difficulty" in light of the small size of the area and his issues with movement, so he was sent back to continue working in the training office. (ECF No. 25-5, PageID.180).

[5] When Plaintiff finally reported to Deputy Warden Stephenson, he was told, "I don't have anything for you, so you can go back upstairs and work with Felder." (ECF No. 26-3, PageID.336-37, 385). It is unclear how exactly Plaintiff spent the remainder of his time in TE status.

25-7, PageID.191). According to Plaintiff, for more than four years, HR had "found ways to maintain[] [Officer MacLean's] presence at [MCF] whether he met working out of class qualifications or not." (*Id.*). The Warden responded that Plaintiff would be considered for the same placement opportunities as Officer MacLean "if [the] circumstances permit[ted]" but implied that Officer MacLean's situation was different because he had been "cleared to return to full duty." (*Id.*).

It is unclear, however, how different their situations actually were. According to Plaintiff, when he and the Warden had discussed the matter three weeks earlier,[6] the Warden acknowledged that Officer MacLean "ha[d] worked on light duty for four years," but stated that it "took place before [he] got [t]here." (ECF No. 26-3, PageID.331). In his deposition, the Warden could not recall the precise details of this meeting—only that he had explained to Plaintiff that "according to HR," his "eligibility for any type of [TE] had come to an end" and could not be extended any further. (ECF No. 25-10, PageID.200; ECF No. 26-3, PageID.326, 330-31).[7]

Out of options, Plaintiff filed a formal request for accommodations on July 12. (ECF No. 25-6, PageID.188). This would turn out to be his last day at work.

---

[6] It was at this meeting in mid-June that Plaintiff was first informed of the sexual harassment investigation. (ECF No. 26-3, PageID.390-91).

[7] Plaintiff states that he told the Warden he only wanted to be accommodated until August 11, which would have allowed him to take FMLA leave rather than waived rights leave. (ECF No. 26-3, PageID.322, 357-58). The difference, according to Plaintiff, would have been a guaranteed position at MCF following surgery. (*Id.* at 322). It is unclear whether Plaintiff actually would have been eligible for further FMLA leave after August 11.

(ECF No. 30-3, PageID.838). Plaintiff's request stated that for six weeks or until he was able to schedule a hip-replacement surgery, he required the same restrictions that he had received since returning to MCF in December 2017. (ECF No. 25-6, PageID.189; ECF No. 26-6, PageID.471, 484, 493, 502, 512, 516). On August 1, Plaintiff emailed Ms. Davis and Ms. Bridgford to get an update. (ECF No. 25-8, PageID.193). He noted that MCF had twenty-seven corrections officer vacancies and argued that "there [were] positions such as the Front Desk, Bubble[,] or other areas where [he] could be utilized." (*Id.*). Although Plaintiff did not receive a response to that email, his accommodations request was formally denied later that day. (ECF No. 26-3, PageID.387; ECF No. 26-8, PageID.632-33).

In addition to a denial letter, Plaintiff received an "Options Designation Form," which notified him that if he could not return to normal work by August 10, his choices were to retire, resign, be placed on a medical layoff, or take a waived rights leave of absence. (ECF No. 26-9, PageID.641-42). On August 3, Plaintiff sent a fax to Ms. Davis, disputing the denial decision and arguing that MCF was short-staffed, that there were available light duty positions, including one in the warehouse, and that he was being treated differently than Officer MacLean. (26-3, PageID.388-89; 26-8, PageID.629-31). Although Ms. Davis forwarded Plaintiff's dispute to Ms. Bridgford, it is unclear whether Plaintiff ever received a formal

response. (ECF No. 26-11, PageID.647).[8] On August 9, feeling as though he had no meaningful choice, Plaintiff selected waived rights leave. (ECF No. 26-3, PageID.313; ECF No. 26-9, PageID.643).

## B.   Plaintiff's Alleged Misconduct and Attempted Return to Work

The final months of Plaintiff's employment at MCF were also occupied by a misconduct investigation. On June 9, Gabrielle Buffa, a recently hired Registered Nurse ("RN"), had lodged a sexual harassment complaint against Plaintiff. (ECF No. 26-5, PageID.419-421, 435-36). Her complaint alleged that Plaintiff had made her feel "very uncomfortable" during new employee training in late May by repeatedly making comments "about [her] appearance and physique, as well as 'how attractive' [she] was." (*Id.* at 435-36). On June 28, Plaintiff received formal notice that MDOC had opened an investigation into these allegations and that he would soon be interviewed. (ECF No. 26-3, PageID.384; ECF No. 26-5, PageID.443).

During Plaintiff's interview on August 7, MCF Inspector Kristopher Steece searched Plaintiff's email for evidence that might confirm RN Buffa's allegations. (ECF No. 26-5, PageID.456). He found "no indications of any sexual or inappropriate . . . emails," but did discover "personal emails to non MDOC staff and

---

[8] In her message, Ms. Davis stated that Officer MacLean was currently "working full duty" but "had [previously] . . . work[ed] on light duty and/or transitional employment assignments," as well as "out of class in a vacancy." (ECF No. 26-11, PageID.647). She also speculated that "[d]ue to the multiple times he's been off work and/or in a light duty status and working out of class, it may seem to others that [Officer MacLean] was being accommodated over his entitlements." (*Id.*).

from a housing realtor." (*Id.*; ECF No. 26-12, PageID.650). According to Plaintiff, Inspector Steece stated that having these emails "wasn't a problem." (ECF No. 26-3, PageID.329). Nevertheless, Inspector Steece referred his discovery to the Warden, citing a possible violation of an MDOC rule prohibiting improper computer use. (ECF No. 25-12, PageID.217; ECF No. 29-3, PageID.759).

On August 28, although Plaintiff had been placed on waived rights leave and was no longer working at MCF, the Warden determined that a separate investigation into his computer use was warranted. (ECF No. 29-3, PageID.760). Acting Inspector Eric Herbert was assigned to the investigation. (ECF No. 29-4, PageID.765). On August 31, the Warden submitted a request to the Michigan Department of Information Technology for all emails sent and received by Plaintiff between May 1 and August 1. (ECF No. 29-5, PageID.770). But a little over a week later, he and Inspector Herbert were informed that Plaintiff's email account had been deleted and that his messages were no longer accessible. (*Id.* at 771).

On September 26, Internal Affairs concluded that there was insufficient evidence to support RN Buffa's allegations and closed the sexual harassment investigation. (ECF No. 26-5, PageID.414-16, 419-33). The second investigation, however, remained open, and on October 6, a questionnaire was mailed to Plaintiff regarding his email usage. (ECF No. 29-4, PageID.766; ECF No. 29-7, PageID.782-83; ECF No. 29-8, PageID.788). This was the first time anyone at MDOC had

attempted to contact Plaintiff about the email allegations even though the investigation had been open for nearly two months. (ECF No. 29-4, PageID.766). Unfortunately, the letter was not delivered to Plaintiff until October 10, the day after his response was due. (ECF No. 29-7, PageID.782, 784-85). Plaintiff claims that he subsequently mailed the questionnaire back, however, Inspector Herbert claims that he never received a response from Plaintiff. (ECF No. 26-3, PageID.327-28, 401; ECF No. 29-4, PageID.766, ECF No. 29-8, PageID.788).

Ultimately, Inspector Herbert concluded that there was insufficient evidence to support a finding that Plaintiff had used his computer improperly. (ECF No. 29-8, PageID.789). Nevertheless, Plaintiff was found guilty of violating work rule #38, "Reporting Requirements," based solely on his alleged failure to respond to the questionnaire. (*Id.*). And because Plaintiff was not working, he was not informed of Inspector Herbert's findings nor given an opportunity to deny the charges. (ECF No. 26-3, PageID.329, 396; ECF No. 29-9, PageID.791; ECF No. 29-10, PageID.793).

In October 2018, Plaintiff finally had hip-replacement surgery. (ECF No. 26-3, PageID.297). It was a success, and after many months of rehab, Plaintiff felt ready to return to work. (*Id.* at 376, 380-82). Accordingly, on August 22, 2019, Plaintiff sent a message to MDOC stating that he had been cleared by his doctor to return to active duty and was requesting reinstatement as a corrections officer. (ECF No. 26-13, PageID.674). Just under a month later, however, his request was denied. (*Id.* at

10

678, 680).[9] The apparent reason was Plaintiff's "pending discipline for violating work rule #38 Reporting Requirements." (ECF No. 29-12, PageID.797).

## II.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.' And a genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the [nonmoving] party.'" *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations omitted) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); then quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

The moving party bears the burden of demonstrating an absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a "genuine issue" for trial via "specific facts." Additionally, the moving party is entitled to summary judgment when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

---

[9] Because Plaintiff had been placed on a waived rights leave and had pending discipline, his rehire request had to be approved by both the Deputy Director of Budget and Operations and the Deputy Director of Correctional Facilities Administration. (ECF No. 25-5, PageID.183; ECF No. 26-15, PageID.680).

*Abu-Joudeh*, 954 F.3d at 840 (citations omitted) (quoting *Celotex Corp*., 477 U.S. at 322, 324). The Court views all of the facts in the light most favorable to the nonmoving party and draws "all justifiable inferences" in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   ANALYSIS

The Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701 *et seq.*, prohibits federally funded programs and activities from discriminating against disabled individuals who are "otherwise qualified" for participation in, or benefits from, those programs and activities. 29 U.S.C. § 794(a); *see* 28 C.F.R. 42.540. In analyzing claims under the RA, courts generally look to caselaw interpreting the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq. See McPherson v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453, 459-60 (6th Cir. 1997) (en banc). This is because the RA "specifically incorporates the standards applied under the ADA to determine violations," *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 344-45 (6th Cir. 2020) (citing 29 U.S.C. § 794(d)). This includes 42 U.S.C § 12203, the ADA's anti-retaliation provision. *See A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 696-97 (6th Cir. 2013).

## I.   **Failure to Accommodate**

Both Plaintiff and Defendants move for summary judgment on Plaintiff's failure to accommodate claim. (ECF No. 25, PageID.91; ECF No. 26, PageID.225). The first question is whether this claim should be analyzed through a direct-evidence framework or an indirect-evidence framework. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016).

Where a plaintiff's evidence requires "inferential leap[s]," it is considered indirect, and the court must apply the familiar *McDonnell Douglass* burden-shifting framework to determine whether the plaintiff has made out a prima facie case of discrimination. *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 452 (6th Cir. 2021); *see Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Where, however, the plaintiff has direct evidence of discrimination—evidence that "explains itself" and "does not require the fact finder to draw any inferences," *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013) (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004))— "there is no need for a *McDonnell Douglas* type burden shift and traditional burdens of proof will apply." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc). Here, Plaintiff contends that the direct-evidence test is appropriate for his failure to accommodate claim, while Defendants

13

argue that the indirect test applies. (ECF No. 25, PageID.104-05; ECF No. 30, PageID.813).

The Sixth Circuit analyzed the proper evidentiary framework for failure to accommodate claims in *Kleiber v. Honda of Am. Mfg.*, a case arising under the ADA. 485 F.3d 862 (6th Cir. 2007). There, the court explained that "claims premised upon an employer's failure to offer a reasonable accommodation *necessarily* involve direct evidence (the failure to accommodate)" because "failing to make a reasonable accommodation falls within the ADA's definition of 'discrimination.'" *Id.* at 868 (emphasis added) (citing *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1283 (7th Cir. 1996)). This ADA definition, 42 U.S.C. § 12112(b)(5), is incorporated by reference into the RA. *See* 29 U.S.C. § 794(d); 28 C.F.R. § 42.511. Accordingly, Plaintiff's failure to accommodate claim under the RA should also be analyzed using the direct-evidence test. *See, e.g.*, *Hobson v. Austin*, No. 21-5308, 2022 U.S. App. LEXIS 476, at *8 (6th Cir. Jan. 6, 2022) (applying *Kleiber* to the RA).

Defendants' contention that *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409 (6th Cir. 2020), compels a different conclusion, is erroneous. (ECF No. 30, PageID.813-14). In *Fisher*, the Sixth Circuit tried to identify why, after *Kleiber*, use of the indirect test in failure to accommodate cases persisted. *Fisher*, 951 F.3d at 416-17 (collecting cases). The court determined that the doctrinal confusion stemmed from a single case, *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), which "applied the indirect

test when analyzing a failure to accommodate claim under the [RA], not the ADA."

*Fisher*, 951 F.3d at 417. Because *Fisher* involved the ADA and not the RA, however, the court held that *Kleiber* controlled. *See id.* ("[T]hough the two statutes have many similarities, they are not identical." (citing *Lewis*, 681 F.3d at 314-17)). But the *Fisher* court did not reach a conclusion as to the proper framework to apply in future RA cases—its holding only concerned the ADA. Accordingly, it does not bind the Court in this RA case. Moreover, the distinction to which *Fisher* alluded—the fact that the RA contains a "sole-cause" standard, while the ADA requires only "but-for" cause,[10] *see Lewis*, 681 F.3d at 317—does not preclude a direct-evidence approach in failure to accommodate cases. A closer look at *Monette*, the seminal disability discrimination case on which *Kleiber* relied, confirms this.

Although *Monette* involved the ADA rather than the RA, its analysis proceeded under the RA's heightened "sole-cause" standard.[11] 90 F.3d 1173, 1178 (citing *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995)). And like

---

[10] Unlike the ADA, which prohibits employment discrimination "on the basis of disability," 42 U.S.C. § 12112(a), the RA proscribes discrimination "solely by reason of . . . disability." 29 U.S.C. § 794(a). In other words, while a plaintiff can prevail on a discrimination claim under the ADA by demonstrating that disability was the "but-for" cause of their employer's actions, a discrimination plaintiff must go further under the RA and prove that disability was the "sole cause" of their employer's actions. *Bent-Crumbley*, 799 F. App'x at 345.

[11] In *Lewis*, the Sixth Circuit, sitting en banc, abrogated *Monette* to the extent that it imported the RA's sole-cause standard into the ADA. 681 F.3d at 317 ("The sole-cause standard in the end is a creature of the [RA], and that is where we should leave it."). However, *Monette*'s entire analysis still remains good law in the RA context, as do other pre-*Lewis* decisions interpreting the ADA.

*Kleiber*, *Monette* found that failure to accommodate claims "are suitable for analysis under the direct-evidence framework" because they "fall within the category of cases in which the employer relies on the employee's disability in its decision-making." *Kleiber*, 485 F.3d at 869 (citing *Monette*, 90 F.3d at 1182-84). In other words, contrary to what *Fisher* implied in its attempt to reconcile the split between *Kleiber* and *DiCarlo*, the RA's sole-cause requirement is not a sound basis for precluding a direct-evidence approach in failure to accommodate cases. Instead, the Court finds that the framework outlined in *Kleiber* and *Monette* applies with equal force to the RA.

Under the direct-evidence framework, Plaintiff must first establish that he was "disabled." *Monette*, 90 F.3d at 1186. Here, although Ms. Bridgford initially argued in an email that "[h]ip pain is not a disability," Defendants now concede that Plaintiff was disabled during the relevant period. (ECF No. (ECF No. 25, PageID.106; ECF No. 25-5, PageID.179; ECF No. 26, PageID.243). The Court agrees with this assessment. *See* 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A), (2)(A).

Next, Plaintiff must demonstrate that he was "'otherwise qualified' for the position despite his . . . disability." *Monette*, 90 F.3d at 1186. To do this, he must show that he was able to perform its "essential functions," 42 U.S.C. § 12111(8), "a) without accommodation from [his] employer; b) with an alleged 'essential' job

requirement eliminated; or c) with a proposed reasonable accommodation." *Monette*, 90 F.3d at 1186.

During the entirety of Plaintiff's time on TE, he was still technically employed as a corrections officer. (ECF No. 26-7, PageID.624-25). Accordingly, the relevant inquiry is whether he could perform the essential functions of a corrections officer, not whether he could perform the functions of someone on TE. *See Lai Ming Chui v. Donahoe*, 580 F. App'x 430, 434-35 (6th Cir. 2014) (declining to define plaintiff's position based on "the duties of her rehabilitation assignment"); *see also, e.g.*, *Mannan v. Colorado*, 841 F. App'x 61, 70 (10th Cir. 2020) ("Mr. Mannan's essential functions were those of a [corrections officer], not his tasks when temporarily assigned to the control room."); *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).

Ordinarily, "[t]he inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998); *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988)). Here, however, the Court need not engage in this analysis because has Plaintiff conceded "that [he] could not perform every essential function of a corrections officer." (ECF No. 25, PageID.109).[12]

---

[12] At a minimum, it seems plain that one of the essential responsibilities of a corrections officer is the ability to physically restrain people. (ECF No. 26-2, PageID.255; ECF No. 26-3, PageID.355).

Instead, Plaintiff argues that MDOC was required to accommodate him via a continued TE assignment. (*Id.* at 109-10). But "the [Rehabilitation Act] does not compel an employer to convert temporary positions it has set aside into permanent positions for its disabled employees." *Hoskins*, 227 F.3d at 730 (citing *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667 (7th Cir. 1998)); *accord Thompson v. E.I. DuPont deNemours & Co.*, 70 F. App'x 332, 337 (6th Cir. 2003). "Defendant[s] [are] simply not required to engage [Plaintiff] in temporary light-duty assignment in perpetuity." *Thompson v. Henderson*, 226 F. App'x 466, 474 (6th Cir. 2007).

> To [hold] otherwise would actually frustrate the purposes of the [Rehabilitation Act]: [I]f employers are locked into extending temporary positions for injured workers on a permanent basis (whether initially granted consistent with company policy or as a well-intentioned special arrangement), they might well be less inclined to permit such an arrangement in the first place.

*Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527, 532 (6th Cir. 2013).

True, as a general matter "an employer has a duty . . . to consider transferring a disabled employee who can no longer perform his old job . . . to a new position within the [c]ompany." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000); *see* 42 U.S.C. § 12111(9) (defining "reasonable accommodation" as including "job restructuring" and "reassignment to a vacant position"). But this

---

No reasonable juror could find that Plaintiff, who was unable to kneel, squat, twist, or bend, would have been able to fulfill this function in mid-2018. (ECF No. 25-6, PageID.189).

"duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so." *Hoskins*, 227 F.3d at 730.

Here, Plaintiff has failed to offer evidence of a unique, funded position into which he would have been qualified to transfer. *See Willard v. Potter*, 264 F. App'x 485, 487-88 (6th Cir. 2008) (holding that where a plaintiff argues they should have been accommodated via reassignment, they must "identify a vacant, *funded* position" (emphasis added) (citing *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004))). The only "positions" Plaintiff identified were a warehouse storekeeper position, for which he was found unqualified, and the continuation of TE status. (ECF No. 26-8, PageID.630; ECF No. 26-11, PageID.647). However, Plaintiff has introduced no evidence that a TE assignment is a distinct, funded position. On the contrary, the evidence before the Court—testimony from the Warden and Ms. Davis—makes clear that TE is "not a funded position," (ECF No. 25-10, PageID.200), nor "a specific job," but rather "duties from different jobs that a person can do while they're recovering" from a temporary impairment. (ECF No. 26-7, PageID.614).

Plaintiff's failure to identify a vacant, funded position also dooms his "interactive process" argument. Plaintiff is correct that once an employee makes a request for accommodations, the employer has a duty to engage in an "informal, interactive process," 29 C.F.R. § 1630.2(o)(3), requiring "communication and good-

19

faith exploration of possible accommodations." *Kaminsky v. Wilkie*, 856 F. App'x 602, 606 (6th Cir. 2021) (quoting *Kleiber*, 485 F.3d at 871). But "an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that [there was a position for which] []he was qualified." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc)). Here, Plaintiff has failed to create a genuine factual dispute that there was a vacant position to which he could have been reassigned or an accommodation that would have enabled him to perform the essential functions of a corrections officer. Accordingly, even if Defendants had failed to engage in the interactive process, which does not appear to be the case,[13] their failure to do so would not save Plaintiff's claim. *Id.*

At bottom, Plaintiff is "request[ing] an 'accommodation that exempts [him] from an essential function.'" *EEOC*, 782 F.3d at 763 (quoting *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012)). In such cases, "'the essential functions and reasonable accommodation analyses . . . run together.' One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *Id.* (quoting *Samper*, 675 F.3d at 1240). Plaintiff has thus failed to

---

[13] The Warden, for example, testified that "he and [Plaintiff] talked about every possible option." (ECF No. 25-10, PageID.200). And Plaintiff acknowledges that the Warden was the one who told him about the vacancy in the warehouse, though Plaintiff ultimately turned out to be unqualified for that position. (ECF No. 26-3, PageID.390; ECF No. 26-11, PageID.647).

satisfy his "burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette*, 90 F.3d at 1183. Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure to accommodate claim.

## II. Retaliation

As Plaintiff repeatedly clarifies, his retaliation claim is not based upon MDOC's refusal to re-hire him, but rather the allegedly "baseless disciplinary investigations and conduct" that followed his placement on waived rights leave. (ECF No. 29, PageID.704). Only Defendants move for summary judgment on this claim. (ECF No. 25, PageID.104; ECF No. 26, PageID.225).

At the outset, the Court notes that both parties seem to agree that the *McDonnell Douglas* burden-shifting framework is appropriate. (ECF No. 26, PageID.244; ECF No. 29, PageID.703). Because the claim relies upon indirect evidence, the Court approves of that approach. *See M.J.*, 1 F.4th at 452.

> Under [the *McDonnell Douglas*] paradigm, a plaintiff must first demonstrate a prima facie case of retaliation by showing that (1) [they] engaged in protected activity under . . . [the Rehabilitation Act], (2) the defendant[s] knew of the protected activity, (3) the defendant[s] took an adverse action against the plaintiff, and (4) there was a causal connection between the adverse action and the plaintiff's protected activity.

*Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 661 (6th Cir. 2020) (citing *A.C.*, 711 F.3d at 697). Demonstrating a prima facie case of retaliation

is a "low hurdle," which Plaintiff readily clears. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001)).

Plaintiff's requests for accommodations were protected activity about which Defendants were aware. (ECF No. 25-3, PageID.159-65; ECF No. 25-6, PageID.188; ECF No. 25-7, PageID.191; ECF No. 25-8, PageID.193; ECF No. 26-8, PageID.632-34); *see A.C.*, 711 F.3d at 698 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007); *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n.8 (6th Cir. 2011)).

Plaintiff has also shown that Defendants took one or more adverse actions. *See A.C.*, 711 F.3d at 698 (explaining that "[t]o be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances' cannot qualify" (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). An investigation that, when viewed in the light most favorable to the plaintiff, appears "frivolous and malicious," can constitute an adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). As can being "reprimand[ed] for breaking selectively enforced policies." *Id.* Here, Plaintiff's evidence that the Warden 1) launched an investigation into his computer usage even though he was no longer working at MCF, and 2) imposed discipline on him for an alleged violation that did not occur until *after* he had

22

terminated his employment,[14] sufficiently demonstrates an adverse action. (ECF No. 29-3, PageID.760; ECF No. 29-10, PageID.793); *see A.C.*, 711 F.3d at 699 (explaining that district courts must "examine[] . . . prima facie proofs 'independent of the nondiscriminatory reason "produced" by the defense as its reason'" for the [adverse action]" (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000))).

Finally, Plaintiff has demonstrated a causal connection between his protected activity and the adverse action. "[A]t the prima facie stage, [this] burden is minimal." *A.C.*, 711 F.3d at 699. All a plaintiff must do is "put forth some evidence" that is "sufficient to allow 'an inference . . . that the adverse action would not have been taken had the plaintiff' not engaged in protected activity." *Id.* (omission in original) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563, 566 (6th Cir. 2000)). Often, "[t]emporal proximity can . . . help meet this causal burden." *Id.* (citing *Nguyen*, 229 F.3d at 563. Indeed, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough [on its own] to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, the

---

[14] Taking waived rights leave "terminates state employment," (ECF No. 26-9, PageID.643), and requires the employee to be "rehired" before they can return to work. (ECF No. 29-12, PageID.798).

23

temporal proximity between Plaintiff's formal accommodations request (July 12) and the Warden's decision to launch the second investigation (August 28) raises an inference of causation and complete the prima facie checklist. (ECF No. 25-6, PageID.188; ECF No. 29-3, PageID.760); *see, e.g.*, *Kirilenko-Ison*, 974 F.3d at 664-65 (noting "that a lapse of two months [i]s [alone] sufficient to show a causal connection based on temporal proximity" (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012)).

Because Plaintiff has demonstrated a prima facie case of retaliation, "the burden of production shifts to . . . [D]efendant[s] to show . . . 'a legitimate, non-discriminatory basis' for the adverse action[s]." *Kirilenko-Ison*, 974 F.3d at 661 (quoting *Nguyen*, 229 F.3d at 563). This, they do.

First, Defendants offer evidence that the origin of the investigation into Plaintiff's computer usage was not the Warden, but Investigator Steece, who discovered a potential violation while investigating Plaintiff for sexual harassment. (ECF No. 31, PageID.857). In deposition, Inspector Steece testified that making a referral to the Warden was routine practice when an investigation uncovered evidence of an unrelated violation. (ECF No. 25-12, PageID.217; ECF No. 29-3, PageID.759). In addition, Defendants argue that, regardless of whether Plaintiff mailed back his questionnaire, MDOC never received it, and was thus justified in finding that he had violated work rule #38. (ECF No. 26-12, PageID.654-56).

24

Finally, Defendants argue that the Warden did not oppose Plaintiff's rehiring, and consequently, could not have had a retaliatory motive. (ECF No. 26-14, PageID.678). This evidence of neutral investigatory purposes is sufficient to shift the burden back to Plaintiff, who must show "that a reasonable juror could find that . . . [D]efendant[s'] reasons [are] pretextual." *Kirilenko-Ison*, 974 F.3d at 667.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). At bottom, however, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 400 n.4. Here, Plaintiff proceeds under the second method and "has produced evidence from which a jury could reasonably doubt . . . [Defendants'] explanation." *Id.*

First, as Defendants concede, the Warden's decision to place Plaintiff under investigation for allegedly sending personal emails is unusual. (ECF No. 31, PageID.856). Indeed, in deposition, Inspector Herbert testified that he could not recall ever investigating someone for that rule violation. (ECF No. 29-4, PageID.767). Second, the fact that the Warden launched this investigation despite Plaintiff no longer being employed by MDOC is even more unusual. (ECF No. 29-

25

3, PageID.760). Although Defendants have pointed to three other individuals who were investigated for allegedly violating the same rule as Plaintiff, Defendants have not pointed to any misconduct investigations ever launched against a former employee. (ECF No. 30-2, PageID.832). Third, it is also strange that the Warden not only remained personally involved in the investigation after appointing Investigator Herbert, but also requested three months of Plaintiff's emails from the Michigan Department of Information Technology instead of the recommended two weeks. (ECF No. 29-3, PageID.760; ECF No. 29-5, PageID.770). Finally, the circumstances surrounding the mailing of the questionnaire to Plaintiff suggest that Plaintiff was set up to fail. Although the questionnaire was due back by October 9, it was not mailed to Plaintiff until October 6, and he did not receive it until October 10. (ECF No. 29-7, PageID.782, 784). Even if he had mailed it back immediately, his response would have been untimely and still potentially subject to discipline. (*Id.*). Add to this the issue of temporal proximity discussed above, and Plaintiff has created a triable question as to pretext.

Defendants' attempts to offer explanations for these many peculiarities are not persuasive. For example, Defendants argue that the Warden's broad email request "makes sense because May was the timeframe of the alleged events of the sexual harassment complaint." (ECF No. 31, PageID.858). But sexual harassment was not the subject of the second investigation—the only issue was whether Plaintiff had

26

misused his official email account by sending personal emails. (ECF No. 29-8, PageID.787-89). And the only reference date MDOC had from the prior investigation was November 7, 2014, the date Plaintiff sent an email to a co-worker about a dress he thought "she would look good in." (ECF No. 26-5, PageID.433). But instead of looking for other emails around that time or following the two-week recommendation of the Michigan Department of Technology, the Warden requested a three-month period that just happened to coincide with the dates during which Plaintiff's accommodations dispute arose. (ECF No. 29-5, PageID.770).

Defendants' contention that "[Plaintiff] received no discipline, secret or otherwise" is also unpersuasive. (ECF No. 31, PageID.858). After Plaintiff allegedly failed to return the questionnaire, a disciplinary report was added to his file stating that his violation of work rule #38 had been substantiated. (ECF No. 29-10, PageID.793). Although a disciplinary conference was not held, the evidence suggests that the existence of this violation factored into the decision not to rehire him. (*Id.*; ECF No. 29-12, PageID.797). Plaintiff has likewise offered evidence that the results of the investigation into his emails, including the ensuing questionnaire violation, were never shared with him. (ECF No. 26-3, PageID.329).

Ultimately, in light of all the available evidence, a reasonable jury could conclude that the Warden, frustrated by Plaintiff's many accommodations requests and repeated accusations of favoritism, decided it would be worthwhile to launch an

27

investigation into Plaintiff's email use, even though he was no longer an employee, in the hope of uncovering evidence that might stymie Plaintiff's eventual return to MCF. A reasonable jury could further conclude that when the Warden's effort to obtain Plaintiff's emails failed, a new disciplinary violation was entered against Plaintiff without his knowledge to achieve the same result. Accordingly, Defendants are not entitled to summary judgment on this claim.

CONCLUSION

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment [25] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [26] is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 31, 2022